IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Randy Williams and Mary Williams, | ) | C/A No.: 3:08-3432-JFA |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| APAC Atlantic Inc., APAC Inc., APAC | ) | |
| Carolina Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter comes before the court on the defendants' motion for summary judgment filed December 15, 2009 [dkt # 30]. On February 5, 2010, the court heard oral argument and took the matter under advisement. This order serves to announce and memorialize the court's ruling on the motion. For the reasons stated herein, defendants' motion for summary judgment is granted.

I.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Randy Williams was a tanker truck driver employed by Curtis Oil Company delivering hot asphalt. On October 3, 2005, while offloading the asphalt at defendant's facility in Sumter, South Carolina, Williams was sprayed with hot asphalt. He alleges that the hook up equipment comprised of certain piping was not working properly and caused the pressurized hot asphalt to spray on him. Williams filed this action asserting a negligence claim against defendants, and his wife, Mary Williams, asserts a loss of consortium claim. Defendants deny the allegations. The majority of the facts are not in dispute, but pursuant

to Fed.R.Civ. P. 56, the court views the facts in the light most favorable to the plaintiff, and adopts the presentation of facts as outlined in plaintiff's opposition memorandum.

As an employee of Curtis Trucking, plaintiff was unloading liquid asphalt from his tanker trailer into APAC's liquid asphalt storage tank by using a transfer hose and quick connect camlock coupling system. The transfer hose connects the storage tank and the tanker trailer to each other. One end of the hose has a female quick connect coupling ("female coupling"), which mates with a male quick connect coupling ("male coupling") located on the tanker trailer's drain valve (collectively referred to as "the couplings"). To connect the hose to the trailer's valve, a trucker inserts the male coupling into the female coupling, and manually pulls down two external levers ("dogears") on the female coupling to ensure that the connected couplings are locked into place. After the hose is connected to the tanker trailer via the couplings, the trucker turns on the storage tank's pump, which suctions the liquid asphalt through the hose and into the tank. Following activation of the storage tank's pump, the trucker opens the trailer's dome (to allow air into the trailer) and turns on the trailer's drain valve, which allows the liquid asphalt to begin to transfer through the hose and into the storage tank. The internal liquid pressure of the asphalt then causes the asphalt to drain from the trailer. A pump that creates suction force on the truck side of the pump assists the gravitational flow of liquid asphalt. A full tank of liquid asphalt takes about thirty minutes to an hour to unload.

In delivering the liquid asphalt load to the APAC plant, plaintiff: (1) backed the tanker trailer to APAC's unloading station; (2) put on his "safety gear;" (3) hooked the transfer hose

2

to the trailer; (4) climbed on top of the trailer and opened the trailer's hatch to allow air inside of the trailer; (5) climbed down to the ground and turned on the trailer's valve; and (6) turned on the storage tank's pump. Plaintiff, in recalling this process, testified that the transfer hose "seemed to fit right" when he connected it to the trailer's valve. Plaintiff claims that, despite activation of the trailer's valve and the storage tank's pump, the liquid asphalt was not transferring or pumping into the APAC storage tank. After turning the trailer's valve and the storage tank's pump off, plaintiff allegedly reported the problem to the APAC "supervisor," who told plaintiff to have an APAC employee assist him.

APAC has a position called the "lookout." Part of the lookout's duties include looking after drivers safety and assisting, if asked. According to plaintiff, the APAC employee unhooked and rehooked the transfer hose. Plaintiff specifically recalled seeing the APAC employee "clamp" the hose back down, and "[f]rom [plaintiff's] knowledge it looked like [the APAC employee] hooked it up right." However, plaintiff specifically denies having an opinion that it was actually hooked up correctly, stating "I'm not going to say that he (APAC employee) did hook it up right. I am not going to say that." The APAC employee then turned the trailer's valve and the storage tank's pump back on. The APAC employee subsequently used a blow torch on the transfer hose to heat dried, solidified asphalt inside of the transfer hose which may cause a blockage and prevent liquid asphalt from flowing through the hose. In the process of using the blow torch on the hose, the APAC employee apparently burned the air line that served the brakes on plaintiff's tanker trailer.

Thereafter, plaintiff claims he left the transfer station to return to his truck's cab,

3

removed his safety gear, and entered the cab to attempt to telephone his employer about the air line. After not being able to get a cell phone signal in the cab, plaintiff exited the cab, allegedly put his safety gear (safety hat, gloves, coat) back on, and walked to the transfer station. Plaintiff claims that as he rounded the rear of the trailer and was several feet away from the couplings, he allegedly heard a "splash sound" and felt the hot asphalt on him, describing the asphalt which burned him as a "spray."

At the time of the accident, no APAC employee was at the transfer station and plaintiff claims he does not know how the accident occurred. APAC employee Joseph Davis testified that he although he did not see the spewing start, but that when he "came around then that's when [he] saw it. And [he] saw Mr. Williams on the back of the truck turning the valve," and assisted him. Davis testified that the transfer hose still was connected to the tanker trailer via the couplings, and that hot asphalt was spewing between six to seven feet in the air like a water hose that was under pressure. Because the asphalt had not pooled on the ground, plaintiff suggests that the asphalt had just started spewing when Davis came upon him trying to turn the valve off. Plaintiff then walked to the APAC plant office and advised the plant manager, John Purvis, of his injury. Purvis, who noticed that plaintiff was wearing a short-sleeve shirt, called an ambulance. Subsequently, plaintiff's employer, Sammy Curtis, traveled to the APAC plant and, using the same transfer equipment, unloaded the liquid asphalt from plaintiff's trailer and into APAC's storage tank without incident.

II. DISCUSSION

    A. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Although the court must construe the facts in a light most favorable to the non-moving party, an inference is only reasonable if it is plausible and the evidence is such that a reasonable jury, given the entire record, could draw that inference. Id.

Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Id. at 248; see also Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir.2001). A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248.

5

Summary judgment shall be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322; see also Hooven-Lewis, 249 F.3d at 265. In meeting this burden, the nonmoving party must "go beyond the pleadings" and present affidavits or designate specific facts in depositions, answers to interrogatories, and admissions on file to establish a genuine issue of material fact. Celotex Corp., 477 U.S. at 324; see also M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 163 (4th Cir. 1993). Although the court must draw all justifiable inferences in favor of the nonmoving party, in order to successfully defeat a motion for summary judgment, the nonmoving party must rely on more than "conclusory or speculative allegations," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of "some metaphysical doubt as to the material facts." See Anderson, 477 U.S. at 252; Matsushita, 475 U.S. at 586; Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir.2002); Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 191 (4th Cir.1997). In evaluating the motion for summary judgment, the court "scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial" such that a reasonable jury could find in plaintiff's favor. See Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir.1993); Anderson, 477 U.S. at 252.

B. ANALYSIS

Defendants move for summary judgment on the grounds that: (1) plaintiff's negligence claim is scientifically implausible and lacks any evidentiary support; (2) plaintiff's comparative negligence bars his claim as a matter of law; and (3) plaintiff's wife's loss of consortium claim should be dismissed for plaintiff's failed negligence claim.

Plaintiff claims that APAC's negligence caused the liquid asphalt to spray out several feet from the back of the tanker trailer and burn his left forearm. The accident occurred on October 3, 2005, and plaintiff filed his lawsuit on September 4, 2008. Plaintiff never notified APAC about a potential lawsuit or requested that APAC preserve evidence, such as the couplings, until he filed this lawsuit nearly three years after the accident. Per APAC's procedure, the company routinely discards couplings and other equipment. Plaintiff's decision to wait nearly three years to file this lawsuit has rendered virtually impossible the exact cause of the accident because the actual couplings are no longer available to inspect. Therefore, plaintiff rests his sole claim of negligence on the theory that the APAC employee did not properly secure the coupling, causing it to spray asphalt onto plaintiff.

In order to prove negligence in South Carolina, plaintiff must prove by a preponderance of the evidence that 1) the defendants had a legal duty of care; 2) the defendants failed to discharge that duty; and 3) defendants' breach proximately caused him injury. Ajaj v. United States, 479 F.Supp.2d 501, 549 (D.S.C.2007); Goode v. St. Stephens United Methodist Church, 494 S.E.2d 827, 834 (S.C.1997).

Plaintiff's decision to ignore the offloading process by leaving the transfer station to

7

return to and remain in the cab of the truck, oblivious to the manner and means of the offloading of the asphalt, coupled with his own failure to examine the coupling sufficiently to confirm that it was properly secured, together with his decision, in the face of his prior knowledge that the coupling allegedly always leaked at the Sumter plant, and to round the corner of his trailer within the zone of danger created by the possibility of injury from the leaking asphalt, arguably rises to the level of a cognizable breach of duty for comparative negligence. However, the court need not reach the issue of plaintiff's comparative negligence because plaintiff has failed to support his claim of negligence against defendants.

According to APAC's mechanical engineering expert, Dean Harris, liquid asphalt drains out of the tanker trailer because of gravity and the internal pressure of the liquid, which is "quite low, less than 2 ½ psig." Harris Affidavit at ¶ 7, and Harris Report at 8 (¶ 10) (comparing the 2 ½ psig of liquid asphalt to the fluid pressure of city water, which is between 40 and 60 psig). Because of this low internal pressure, there must have been a "sufficiently large, but restrictive opening in the couplings" in order for liquid asphalt to "spew" like it did during the Incident. Id. at ¶ 12. For such an opening to exist between the couplings, the experts agree that the female and male coupling cannot be completely connected, and one of the female coupling's dog-ears must be released or unclamped. If the female coupling is "only half latched" to the male coupling, the couplings "cock at a slight angle" to each other and there is a "crescent shaped gap on the side whose [dog-ear] is unlocked." Harris Report at 12. If one of the female coupling's dog-ears is opened while the trailer's drain valve was

8

in the on position and enabling disbursement of liquid asphalt, a fan-shaped stream of fluid would have exited from the coupling's gap. Id. Additionally, "[i]f this opening is on the top side of the coupling, it is possible that the low fluid pressure [of the asphalt] would produce a vertical rise of a couple of feet of fluid." Id. Defendants argue that the witness testimony, in addition to plaintiff's own testimony about the nature of the asphalt spew, support the finding that the most probable cause of plaintiff's injuries was plaintiff's own operator error. Defendants argue that no other explanation for the release of liquid asphalt plausibly accounts for the upward spewing of liquid asphalt.

The court finds significant the fact that other truckers use the same coupling without incident before and after the accident, including plaintiff's supervisor Curtis. Immediately after the accident, Curtis testified that he used the same couplings to successfully unload the remaining liquid asphalt in plaintiff's tanker trailer, thereby refuting any speculation that the couplings were defective. Therefore, the court dismisses plaintiff's unsupported allegation that the accident was the result of a defective female coupling.

It is improbable and there is no evidence to suggest that plaintiff's burn injury occurred because dried, solidified liquid asphalt inside of APAC's female coupling prevented that coupling from properly locking to the male coupling. According to APAC's expert, it is "not possible to lock [or clamp the female coupling's dog-ears] if the coupling is not fully inserted." Harris Report at 11. Plaintiff's employer, Curtis, concurred, testifying that if there is solidified asphalt in the female coupling a trucker "wouldn't be able to lock it" to the male

coupling on the trailer. Curtis Depo. at 16:11-16. However, as noted above, such a scenario is entirely inconsistent with plaintiff's own testimony, by which plaintiff admitted that the APAC employee "clamp[ed]" the coupling and connected the hose to the trailer's drain valve. Pl.'s Depo. at 51, 86. Plaintiff also stated that from his "knowledge it looked like [the APAC employee] hooked it up right." Id. at 51. Thus, it implausible that solidified liquid asphalt inside of the female coupling prevented a proper connection between the couplings and resulted in liquid asphalt spraying plaintiff.

Furthermore, it is contrary to the evidence that the liquid asphalt which spewed upward and burned plaintiff was caused by a defective rubber gasket inside of the female coupling.[1] Such a scenario is implausible because the expert testimony reveals that a defective rubber gasket only results in a downward drip of liquid asphalt from the couplings. A defective rubber gasket does not produce an upward spewing of the substance, and is, therefore, an improbable cause of the accident.

Moreover, it is unlikely that the liquid asphalt spewed on plaintiff because the APAC employee allegedly did not clamp down the female coupling's dog-ears and securely fasten the transfer hose to the trailer's drain. Plaintiff's own testimony disputes such a theory as plaintiff testified that he saw the APAC employee "clamp" the hose down, id. at 51-53 and 86, and "[f]rom [Plaintiff's] knowledge it looked like [the APAC employee] hooked it up

---

[1] The court notes that the gasket was replaced at Curtis's request, but there is no evidence that the gasket was defective. Curtis testified that he "didn't check it," but asked that it be replaced, as it is routinely replaced after four or five unloadings. Curtis depo., p. 24-25.

right." Id. at 51. Furthermore, "[g]iven the downward angle of the trailer outlet and the weight of the [transfer] hose, it is doubtful that the hose would have remained connected to the trailer if the [dog-ears] were not locked." Harris Report at 10. According to APAC's expert Harris, if the dog-ears were not locked, the transfer hose "certainly would release [from the trailer] as soon as fluid was introduced into the hose." Id. Plaintiff's employer, Curtis, concurs. In his deposition, Curtis testified that if the female coupling's dog-ears were not locked down, the transfer hose would have "jumped off" the trailer "as soon as" the APAC employee "cut the pump on." Curtis Depo. at 46:5-15. However, based on plaintiff's testimony, a substantial amount of time passed between the APAC employee's "clamping" the transfer hose to the trailer and turning the trailer's valve on to release liquid asphalt into the hose, Pl.'s Depo., at 53:14-18, and the accident. See id. and id. at 51 (describing the following events as happening between the APAC employee's connecting of the hose to the trailer and the Incident: (1) the APAC employee heated the transfer hose with a blow torch; (2) the APAC employee burned the truck's air line with the blow torch; (3) the APAC employee left the transfer station, id. 51, and (4) plaintiff walked to and from the truck's cab). Therefore, it is implausible that plaintiff's injuries occurred because the APAC employee did not clamp down and lock the female coupling's dog-ears.

The court finds the evidence does not supported plaintiff's argument that an APAC employee was negligent in connecting the transfer hose to the tanker trailer's valve or in providing defective or poorly maintained transfer equipment to plaintiff.

Plaintiff's expert testimony is insufficient to save his negligence claim, as the causation testimony does not pass muster under Fed. R. Evid. 702. Admittedly not inspecting the original hose and coupling, nor the truck and associated male coupler, plaintiff's expert inspected "similar equipment," along with a new unused female coupler. With the benefit of plaintiff's deposition and research he conducted on cam and groove couplings, including an article from bulktransporter.com and the coupling manufacturer's catalog, plaintiff's expert assumed the following facts in order for the incident to occur as plaintiff described: 1) the female coupling would be attached to the trailer adapter and look like it was properly secured and latched, 2) the coupling would be attached long enough to allow fluid to start flowing, and 3) the coupling would then come loose when plaintiff walked around the back of the trailer.

Plaintiff's expert concluded that "[t]here are a number of couple conditions that could have existed at the time of [plaintiff's] incident. Further, based on the information provided, I conclude that these conditions are possible given the equipment and the timing involved," and included the following summary:

a. The closed cam levers come open for one reason or another and allow the coupler halves to come apart;
b. The cams in the female coupler are worn enough that the female coupler cams can slide over the male coupler groove;
c. A gasket of the wrong thickness is installed in the female coupler and the proper compression is not applied to the cams to keep them locked in place, the cams loosen and the coupling comes apart;
d. A bad gasket is in the female coupler and the proper compression force is not applied to the cams to keep them locked in place, the cams loosen and the coupling comes apart; or,

e.  Initially, the end of the female coupling has solidified asphalt in and around the wrong thickness gasket or a badly worn gasket. The solidified asphalt is thick enough that the cams initially tighten down properly. As the hot asphalt starts flowing through the coupling, the solidified asphalt in the gasket becomes hot, liquifies and allows the compression force on the cams to be reduced. The cams open up due to the jumping hose movement created by the pump and, not instantly but over a period of time, the coupling comes apart.

Plaintiff's expert concludes that defendants "did not act in a reasonable manner if the female hose coupling was not properly inspected and maintained and came uncoupled due to excessive wear of the cams, a bad gasket or the installation of an improper gasket and the negligence of APAC is a cause of [plaintiff's] injuries."

The plaintiff's expert has "essentially wandered into a metaphysical extrapolation" as to how the coupling managed to come into a position to become uncoupled. Hardesty v. American Seating Co., 194 F.Supp.2d 447, 451 (D.Md. 2002). While the expert's "reasoning and chain of inferences leading to his causation conclusion may be minimally plausible," the court finds that it has not been shown to be based on "sufficient facts or data," Fed.R.Evid. 702(1), that are "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," Fed.R.Evid. 703. Thus, the court finds that plaintiff has not demonstrated that the expert testimony on causation "is the product of reliable principles and methods." Fed.R.Evid. 702(2), 703.

Effectively, plaintiff's argument relies on res ipsa loquitur to prove defendants' negligence. Res ipsa loquitur means "the thing speaks for itself." O'Leary-Payne v. R.R. Hilton Head, II, Inc., 638 S.E.2d 96, 100 (S.C. App.2006)(citing W. Page Keeton et al.,

13

Prosser and Keeton on Torts § 39, at 243 (5th ed. 1984)). According to this doctrine:

> There must be reasonable evidence of negligence; but where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from lack of care.

Id. at 100.

However, res ipsa loquitur is a doctrine that is not recognized in South Carolina. Id.

Even if the court were to permit the inferences of negligence by the defendants to be drawn from the expert's report, there is nothing in the evidence from which it can be inferred that the negligence of the defendants resulted in plaintiff's injury. That is to say, plaintiff has shown no evidence that defendants' breach of some duty was the "thing which caused injury." Negligence is not actionable unless it is the proximate cause of plaintiff's injury. Hughes v. Children's Clinic, P.A., 237 S.E.2d 753, 757 (S.C. 1977). The opinion of plaintiff's expert that defendants "did not act in a reasonable manner if the female hose coupling was not properly inspected and maintained and came uncoupled due to excessive wear of the cams, a bad gasket or the installation of an improper gasket," is insufficient to demonstrate a breach of some duty owed to plaintiff. Further, even assuming such a duty and breach, plaintiff's own expert opines that such a breach would merely constitute a cause of plaintiff's injuries. Such argument fails to defeat defendants' motion for summary judgment, as plaintiff is required to show negligence with "reasonable certainty, not through mere conjecture, and he may not attempt to prove negligence through the doctrine of res ipsa

14

loquitur." Ajaj, 479 F.Supp.2d at 549.

In sum, the court finds plaintiff's negligence claim against APAC fails as a matter of law because even when construed in a light most favorable to plaintiff, there is no reasonable or plausible inference that would allow the jury to determine that plaintiff's injuries were the direct and proximate result of any alleged APAC negligence. In light of the finding that plaintiff has failed to establish a genuine issue of material fact, the court finds it unnecessary to address defendants' comparative negligence argument. Further, the court must dismiss plaintiff's wife's claim for loss of consortium, as it necessarily depends on plaintiff proving defendants' liability for his injuries. See Creighton v. Coligny Plaza Ltd. P'ship, 512 S.E.2d 510, 523 (S.C. App. 1998).

III. CONCLUSION

For the foregoing reasons, the court finds there is no genuine issue of material fact, and grants summary judgment in favor of defendants [dkt. #30].

IT IS SO ORDERED.

*Joseph F. Anderson, Jr.*

February 11, 2010  
Columbia, South Carolina

Joseph F. Anderson, Jr.  
United States District Judge